CARL A. DAHLSTROM v. FLORENCE A. JOHNSON HURTIG.[1]

December 20, 1940.

No. 32,490.

[1]Reported in 295 N. W. 508.

*Sidney Benson, B. H. Bowler,* and *Tautges, Eichelzer & Tautges,* for appellant.

*Freeman & King,* for respondent.

JULIUS J. OLSON, JUSTICE.

Plaintiff's cause to recover damages under our death by wrongful act statute, 3 Mason Minn. St. 1940 Supp. § 9657, met with an adverse verdict. His motion for new trial was denied, and he appeals. As plaintiff strenuously claims that the verdict lacks evidentiary support, it is essential that the facts should be fully stated.

On July 8, 1938, defendant's automobile, a new 1938 Plymouth Tudor sedan, was being driven by her brother, Arthur Johnson, on a trip from Minneapolis with Rochester as their intended des-

tination. The people riding in the car, in addition to Arthur, who occupied the front seat, were Arthur's wife, plaintiff's intestate, and Natalie Johnson, another sister of defendant and Arthur, both of whom occupied the rear seat. The purpose of the trip was to visit an invalid sister of the Johnsons then confined in one of the Rochester hospitals.

Arthur was the only one capable of driving, the ladies disclaiming capacity so to do. Then, too, he was supposed to possess considerable skill in that line, having been the owner of an automobile, although of somewhat older vintage, since 1924. Important also is the fact that he had driven defendant's car to Rochester on two previous occasions. In the course of the trip here involved, at a point on highway No. 52 approximately two miles north of Hader, shortly before noon, the fatal accident occurred, Arthur's wife, plaintiff's intestate, receiving such injuries that she died therefrom August 4, 1939. The other occupants of the car were not seriously hurt. The pavement is 20 feet wide with earth shoulders seven feet in width on each side. The day was clear and warm, and both pavement and shoulders were dry. About three-quarters of a mile north of where the accident occurred there is a gradually descending grade. The pavement has a slight crown in the center, and both sides of it are "dished" at the edges. The purpose of this "dished" construction is to gather rain or melting snow water, carry it toward a spillway on each side of the pavement, and discharge it into road ditches at the bottom of the incline. Each spillway is built of concrete. It is six and one-half feet wide where it leaves the pavement, and it extends across the shoulder, where it tapers down to about one foot in width. It, too, is "dished," its edges being flush with the shoulder but sloping inward to a maximum depth of five inches. The spillway in question was about 200 to 250 feet north of the place of the accident. As defendant's car was being driven in a southerly direction and upon its own, proper side of the pavement, two cars were approaching from the south. When first observed they were traveling in their proper lane of traffic. But suddenly, and when about

150 to 200 feet away, the rear approaching car, seeking to pass the one in front of it, came into defendant's lane of travel so that a head-on collision seemed imminent and inevitable. Defendant's car was being driven at a rate of between 45 and 50 miles per hour, the approaching cars at about the same rate of speed. Extreme danger, in fact disaster, was obvious to Arthur, who promptly turned his car to his right and onto the shoulder. By his promptness collision was avoided, but he apparently lost control of his car. When he got back onto the pavement he applied his brakes, but the car "wanted to go to the left." He "stepped on the brakes, and * * * was pulling the wheel gradually to get her back in the center line, back onto my right side of the road; and every time I stepped on the brakes the car seemed as though it wanted to tip over." The car swayed from side to side and tipped over on its right side on the shoulder to Arthur's right. Skid marks were observed on the pavement at intermittent points, indicating the application of brakes at frequent intervals before the car turned over. It had traveled about 200 feet or more after getting back onto the pavement before it tipped over. When the car came to rest it was found that the "right front side of the car was damaged" and "the right front tire was flat." No one seems to know when or how the tire became flat. In view of its swaying tendency after it got back onto the pavement and its tendency to tip over, it is perhaps fairly inferable that it had become deflated as the car swung back onto the pavement and over the "dished" edge. Plaintiff's theory of liability is based upon excessive speed, failure to keep a proper lookout for approaching cars, negligently driving upon the shoulder of the road, and finally (and this is the point to which plaintiff points as the real basis for liability), Arthur's failure to reduce the speed of the car when he got back onto the pavement, thereby bringing about the resulting harm.

We find no difficulty in reaching the conclusion that there is ample evidence to sustain the verdict. There is, however, one matter which deserves discussion. It is this:

The court charged the jury that if the driver of the car "was suddenly confronted with an emergency, and you further find that that emergency was not brought about by any act of negligence on his part, then if you find that he acted quickly and to *his best judgment* to protect himself, to protect his people, his passengers, even though he may have done some act which if he had a longer time to ponder [he] would not have done, yet if *he used good faith* at the time, that would not constitute negligence, and plaintiff could not recover under those conditions. *The claim on the part of the plaintiff is that subsequent to the emergency he [the driver] was guilty of negligence in the operation of his car, that he failed to use ordinary care or such care as an ordinarily prudent person would exercise under the same or similar circumstances.* Of course you are to take the testimony as it was given; determine from that testimony whether under all the conditions and all the circumstances surrounding the particular event there that he used such ordinary care as a prudent person would have exercised under the same or similar circumstances. Of course if he did, then he would not be guilty of negligence. If he didn't, then of course he would be guilty of a negligent act and liable unless you find further that that act was not the proximate cause of the accident." (Italics supplied.)

Exception was taken to the "emergency rule or doctrine, it being the contention of the plaintiff that the emergency rule is not applicable under the facts and circumstances of this case; that the *emergency had ceased to exist at the time of the accident,* and that the statement of the emergency rule as given by the court is incorrect and an improper statement of the rule." (Italics supplied.)

■ It must be conceded that the emergency rule stated by the court is inaccurate. In the recent case of Johnson v. Townsend, 195 Minn. 107, 110, 261 N. W. 859, 861, we stated the rule to be:

"In that situation [sudden emergency] the law is that one, suddenly confronted by a peril, through no fault of his own, who in

the attempt to escape does not choose the best or safest way, should not be held negligent because of such choice unless it was so hazardous that the *ordinarily prudent person* would not have made it under similar circumstances." (Italics supplied.)

The test is the conduct of "the ordinarily prudent person * * * under similar circumstances." Here the test applied by the court was the driver's "best judgment," his "good faith at the time," so that if he used "his best judgment to protect himself, to protect his people, his passengers," at the crucial time, that would afford a sufficient basis for avoidance of liability.

■ We shall assume that the court's statement of the emergency rule was faulty, but does that require reversal here? The answer to that question depends upon whether prejudice to appellant resulted, since we do not reverse otherwise. "The doctrine of harmless error is gradually being extended by the courts." 1 Dunnell, Minn. Dig. (2 ed. & Supps.) § 416, and cases cited under notes 50 and 52. And "the statute [2 Mason Minn. St. 1927, § 9325] authorizes this court to grant a new trial only for causes materially affecting the rights of an appellant." In re Estate of Shell, 165 Minn. 349, 353, 206 N. W. 457, 459.

■ Another rule "of wide and frequent application" is "that a case will be considered on appeal in accordance with the theory on which the action was conducted on the trial, both as regards the law and the facts." 1 Dunnell, Minn. Dig. (2 ed. & Supps.) § 401. Supporting cases are found under note 48. In the recent case of Harris v. Eggermont, 196 Minn. 469, 473, 265 N. W. 322, 324, the same thought is thus stated: "Cases will be disposed of on appeal within the limits of consideration fixed by the theory upon which they have been tried."

■ The negligence problem upon which this action depends has for its origin what occurred immediately following the entry of the second northbound car into defendant's traffic lane. In the second sentence of the court's quoted instructions (italicized for the purpose of identification) plaintiff's theory in respect to fastening liability upon defendant was fully and fairly stated. That

portion was not challenged, nor could it be. So the verdict necessarily establishes that "subsequent to the emergency" the driver of defendant's car was not "guilty of negligence" in its operation, and that he had not "failed to use ordinary care or such care as an ordinarily prudent person would exercise under the same or similar circumstances." Plaintiff's case was by his own choice made dependent upon the driver's alleged negligence in the way he handled his car after it got back onto the pavement, and that is why he insisted that "the emergency had ceased to exist at the time of the accident." His claim then was, and still is, that "an impending collision * * * was successfully met and had ceased to exist." The cause of this unfortunate accident, initially, arose out of the grossly negligent conduct of the driver of the rear car coming from the opposite direction when he sought to pass the car ahead of him. The facts in this case are much like those we had before us in Cosgrove v. McGonagle, 196 Minn. 6, 13, 264 N. W. 134, where we held as a matter of law that the proximate cause of the accident was the sudden and unexpected appearance of an approaching car in defendant's lane of traffic. So in this case. If defendant's driver was not guilty of actionable negligence after he got back onto the pavement, there is no liability. Until then, the record is clear, the oncoming car was the sole cause of bringing defendant's car out of its rightfully occupied traffic lane. The jury's determination that his conduct after getting back onto the pavement was not negligent, adequately supported as it is by the evidence, disposes of the case on its merits.

Order affirmed.