**In re LERNOUT & HAUSPIE SECURITIES LITIGATION.**

**No. CIV.A. 00–11589–PBS.**

United States District Court, D. Massachusetts.

May 27, 2004.

30

Jeffrey C. Block, Michael T. Matraia, Patrick T. Egan, Berman, Devalerio, Pease, Tabacco, Burt & Pucillo, Boston, MA, S. Gene Cauley, Curtis L. Bowman, J. Allen Carney, Tiffany Wyatt, Cauley, Geller, Bowman & Rudman, LLP, Little Rock, AR, Lee Shalov, Patrick L. Rocco, Shalov, Stone & Bonner, New York City, for Lead Plaintiffs.

Kevin J. Lesinski, Seyforth Shaw, Boston, MA, Michael P. Carroll, Diem–Suong Thi Nguyen, William J. Fenrich, Sean Knowles, ·Davis, Polk & Wardell, New York City, for KPMG LLP.

Robert J. Kaler, Gadsby Hannah, LLP, Boston, MA, for Flanders Language Valley Fund.

Thomas E. Peisch, Timothy M. Barouch, Conn, Kavanaugh, Rosenthal, Peisch & Ford, LLP, Boston, MA, John Missing, Ada Fernandez Johnson, Debevoise & Plimpton, Washington, DC, for RVD Securities, Edwin Vandendriessche, Dirk Cauwelier, and Marc De Pauw.

Stephen Wald, Craig & MacCauley, Boston, MA, for Gaston Bastiaens.

Brian E. Pastuzenski, Christopher F. Robertson, Alison B. Vreeland, Testa, Hurwitz & Thibeault, LLP, Boston, MA, for Francis Vanderhoydonck.

Donald Chase, Morrison, Cohen, Singer & Weinstein, LLP, New York City, Robert P. Sherman, Gordon M. Jones, Nixon Peabody, LLP, Boston, MA, for Pol Hauspie & Nico Willaert.

Gus P. Coldebella, Sarah E. Walters, Goodwin, Proctor, LLP, Boston, MA, for Jo Lernout.

Erik Lund, Vincent Amoroso, Michael J. Stone, Posternak, Blankenstein & Lund, LLP, Boston, MA, Louis M. Solomon, Caroline S. Press, Proskauer Rose, LLP, New York City, for Pal Behets.

Erik Lund, Michael J. Stone, Posternak, Blankenstein & Lund, LLP, Boston, MA, George A. Salter, John A. Redmon, Nicholas W.C. Corson, Hogan & Hartson, LLP, New York City, for KPMG Bedrijfsrevisoren.

Janet B. Fierman, Robert Cohen, Cohen & Fierman, LLP, Boston, MA, John W. Polk, Marc B. Tucker, Jennifer A. Semko, Kris Hansen, Baker & McKenzie, Washington, DC, for Mercator & Noordtar N.V.

Michael P. Connolly, Murtha, Culiina, Roche, Carens & Degiacomo, Boston, MA, Frank C. Razzano, J. Tara Holubar, Dickstein, Shapiro, Morin & Oshinsky, LLP, Washington, DC, for Ellen Spooren.

Gregory P. Joseph, Susan M. Davies, Gregory P. Joseph Law Offices, LLC, New York City, for Filler, et als.

Max W. Berger, Steven B. Singer, Daniel D. Barnes, Berstein, Litowitz, Berger & Grossman, LLP, New York City, for Stonington Partner, et als.

Jack R. Pirozzolo, Willcox, Pirozzolo & McCarthy, Boston, MA, for Bamberg, et als.

Karen C. Dyer, Boies, Schiller & Flexner, LLP, Orlando, FL, Alan K. Kotler, Tracy Z. Frisch, Sean M. Halpin, Reed Smith, LLP, Philadelphia, PA, Terence K. Akner, Law Offices of Patridge, Akner & Horstmann, LLP, Boston, MA, for Baker, et als.

Mathew J. Matule, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, for S.G. Cowen Securities Corp.

Peter M. Saparoff, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC, Boston, MA, Sara Beth Brody, Clifford Chance US, LLP, San Francisco, CA, Sean Miles Murphy, James B. Weidner, Clifford Chance US, LLP, New York City, for Dexia, S.A.

## MEMORANDUM AND ORDER ON CLASS PLAINTIFFS' MOTION TO COMPEL KMPG LLP TO ANSWER INTERROGATORIES... (# 691) [1] AND CLASS PLAINTIFFS' MOTION TO COMPEL KMPG LLP TO PRODUCE DOCUMENTS (# 680)

COLLINGS, United States Magistrate Judge.

### I. Introduction

KMPG LLP ("KMPG") is an accounting firm. Class Plaintiffs' Motion to Compel KMPG LLP to Answer Interrogatories... (# 691) and Class Plaintiffs Motion to Compel KMPG LLP to Produce Documents (# 680) involve actions taken by KMPG and documents generated by KMPG as a result of telephone calls from one "Michael" in Oregon. The calls are described in an e-mail from Jerald W. Richards ("Richards") to Richard M. Breslow ("Breslow") dated June 2, 2000. (# 682, Exh. E) [2] Richards is a KMPG manager; Breslow is an in-house lawyer for KMPG.

The e-mail reads as follows:

Rick:

I have received a series of three calls from a former salesman of an existing KMPG client who alleges that the client is lying to the KMPG audit team and is entering into side agreements to achieve desired accounting results. The only clues that the former employee has divulged about himself is that his name is Michael and that he lives in Portland, OR. He also has not named the company. A summary of the phone conversations follows:

1. I received the first call towards the end of April. Michael called the main number and asked to speak to someone in the audit department. He stated that he had been asked to strike a deal with a customer under two sets of terms. The first set of terms would be shared with

---

1. The motion to compel (# 691) also seeks an order compelling KMPG LLP to produce documents. The Court ruled on that motion on May 24, 2004.

2. Hereinafter, "the Richards e-mail".

KMPG, the second, which contained the true substance of the transaction would not be shared. Michael's understanding of what was going on was that management was trying to achieve adequate sales near the end of the quarter to meet analysts' expectations. Michael believed that the foregoing was wrong, but wanted to discuss the matter anonymously with an auditor. He called the Portland office because this is where he makes his home and he wanted to speak to the firm that performs the external audits for his company.

I talked at length about the fact that the situation that he described was very troubling. I shared with him the fact that the SEC is very concerned about earnings management and that the actions were not only morally wrong, but were illegal. I also discussed the role that reliance on management representations play on the audit process, as well as the concept of limitation of scope. I stated that what he had described was grounds for resigning from an audit engagement and that the reason for the resignation would be required to be included in an SEC filing. About halfway through the conversation Michael played a tape in which I heard another voice tell him to enter into a side agreement and that the side agreement would be kept from KMPG.

Michael indicated that the company in question is a large software company headquartered on the East Coast, that it has operations in Europe and that it was in the process of making a couple of significant acquisitions in stock-for-stock deals.

2. Michael called me again a couple of weeks later to let me know that he had been fired from his job. He had written a letter to a member of the management team that indicated that he was not willing to complete the transaction as requested. He also let me know that he was working with some attorneys in town to pursue his options. Michael stated several times that he had a strong moral problem with the business practices of his former employer and felt that the shareholders and other stakeholders should be aware of what was going on.

3. Michael called me today to let me know that his attorneys intend to file a lawsuit against his former employer. I believe that it will be a wrongful termination suit and will be filed here in Multnomah County, probably next week. He also indicated that the side agreement discussed in our first conversation was the "tip of the iceberg." We did not discuss specifics, but he indicated that his former employer utilized a number of other questionable business practices that, in his opinion, were illegal.

Between the second and third conversations, I received a phone call from a private investigator that was working for Michael's attorneys. The investigator taped my responses to a series of questions that revolved around the timing of my conversations with Michael, that Michael had indicated that he was still employed by the company in question at the time of the first conversation, and the fact that I had heard the tape recording described above.

At this point in time, I still do not know Michael's full name or the name of his former employer. Michael stated that both of the foregoing would become a matter of public record once the lawsuit is filed. My objective in talking to Michael and sharing the information with you is to do what I can to protect the Firm. I would presume that you have access to information regarding suits that are filed here—if so, please have someone watch for this matter so that the appropriate engagement team can be contacted. Please also give me a call at (503) 323–0535 if there is anything that I should or should not be doing.

Jerry

KMPG avers that the Richards e-mail is protected by the attorney-client privilege and that its production to Class Plaintiffs was inadvertent. Class Plaintiffs assert that the production was not inadvertent, and, consequently, the production of the document operated as a subject-matter waiver entitling them to production of all other e-mails and other documents on the same subject. Thus, the first issue to be decided is whether the production was, in fact, "inadvertent."

## II. Was the Production of the June 2, 2000 E–Mail Inadvertent?

The Richards e-mail was produced on April 25, 2003 in a group of eleven boxes of documents. (# 701, Exh. A). A cover letter from Diem–Suong T. Nguyen, Esquire, of the law firm of Davis, Polk & Wardwell of New York, New York ("Davis, Polk") accompanied the documents.

Sean Knowles, Esquire, an associate at Davis, Polk, has submitted a Declaration, Etc. (# 698) in which he states, in pertinent part:

5. . . . On or about April 25, 2003, KMPG LLP produced eleven boxes of documents to Plaintiffs. That production included a *partially-redacted* document bearing Bates Stamp KPMGUS053689–053690 which contained a June 2, 2000 e-mail communication from Jerald W. Richards to Richard M. Breslow (the "Richards e-mail").

6. For purposes of the April 25, 2003 production and other document productions in this litigation, counsel for KMPG U.S. has ensured that licensed attorneys are responsible for document review and production. Each production undergoes reviews involving both junior and senior attorneys. Potentially privileged documents receive heightened scrutiny and are reviewed multiple times to ensure that appropriate decisions are made regarding disclosure or non-disclosure of those documents.

7. The production of the Richards e-mail was inadvertent. The Richards e-mail does not identify Breslow as an attorney, and the attorneys who reviewed the document for production were not aware that Breslow was an attorney at the time of the review and production. The two attorneys who represented Messrs. Breslow and Richards in their December 15, 2000 SEC testimony, Gary Lynch and C. Ian Anderson, are no longer with David, Polk & Wardwell. Messrs. Lynch and Anderson did not perform any of the document review in connection with this litigation.

8. KMPG U.S. has asserted that the communications other than the Richards e-mail

relating to this issue as listed on the SEC privilege log qualify for attorney-client privilege and work product protection; those communications include both fact work product and opinion work product of counsel, including opinion work product on matters other than L & H.

9. In written correspondence dated November 19, 2003, counsel for KMPG U.S. notified counsel for Class Plaintiffs that the production of the Richards e-mail was inadvertent. Counsel for KMPG U.S. also asserted that the inadvertent production of the Richards e-mail did not operate as a subject matter waiver because the facts contained within the Richards e-mail had been disclosed in the Richards SEC testimony transcript. For the same reason, counsel for KMPG U.S. did not request that Plaintiffs return the Richards e-mail.

The history of the Richards e-mail before its production to the Class Plaintiffs on April 25, 2003 is that it was listed on the privilege log which was provided to the SEC in or about December, 2000. (*see* # 682, Exh. D). The events which were reported in the e-mail were the subject of testimony by both Richards and Breslow before the SEC on December 15, 2000. (*see* # 682, Exh. E). KMPG's counsel persisted in asserting that the e-mail was privileged at the depositions before the SEC.

However, the Richards e-mail did not appear on the privilege log provided to Class Plaintiffs in the instant case. (*see* # 682, Exh. B). The explanation in Attorney Knowles' declaration that when reviewing documents requested by Class Plaintiffs two years later," . . . the attorneys who reviewed the document for production were not aware that Breslow was an attorney at the time of the review and production" is not credible. The plain fact is that those attorneys *redacted* part of the document which contained another e-mail from one John M. Guinan, a non-lawyer, to Breslow. This e-mail appears on the privilege log (*see* # 682, Exh. B, p. 6); the reason for the assertion of the attorney-client privilege and work product protection as to this document is because what is redacted is "confidential communication to *le-*

*gal counsel* of information for the purpose of receiving legal advice regarding June 2, 2000 e-mail." (# 682, Exh. B, p. 6)(emphasis added).

It seems manifest that the reviewers were aware of the Richards e-mail ("June 2, 2000 e-mail") and that Breslow was an attorney, since it is noted that the e-mail to Breslow was "to legal counsel." On these facts, the conclusion is inescapable that the reviewers deliberately chose not to assert the privilege as to the Richards e-mail. Any claim that this was "inadvertent" is simply not convincing on this record.

Furthermore, KMPG's attorney confirmed that the decision to produce the Richards e-mail was a deliberate act. On October 10, 2003, Class Plaintiff's counsel, Jeffrey C. Block, Esquire ("Attorney Block") wrote a letter to Attorney Suong T. Nguyen of Davis, Polk ("Attorney Nguyen") complaining of certain respects in which KMPG had allegedly failed to meet its discovery obligations. (*see* # 701, Exh. B). Among other matters, Attorney Block had noticed the fact that the Richards e-mail was described on the privilege log given to the SEC as "[c]onfidential communication from KMPG LLP partner [Richards] to KMPG counsel [Breslow] providing information at the request of counsel for purposes of rendering legal advice regarding *anonymous caller*" while the only item on the privilege log provided to Class Plaintiffs counsel in the instant case was the e-mail from John Guinan to Breslow which was described as "[c]onfidential communication to legal counsel of information for the purpose of receiving legal advice regarding June 2, 2000 e-mail." Noting that these two descriptions were "vastly different," Attorney Block wrote that "[t]his certainly calls into question the veracity of the description KMPG has provided on its privilege log in this action." (# 701, Exh. B)(emphasis in original).

Attorney Nguyen responded in a letter of October 14, 2003 as follows:

> Your complaint regarding our description of the June 5, 2000 e-mail on our privilege log to the SEC and to plaintiffs also lacks merit. If you check the document listed on the log, KPMGUS053689-90, you will see that *we have produced to you* the portion of the document that contains the reference to the so-called "anonymous caller" and have only redacted a different part of the document relating to a communication to legal counsel.

(# 682, Exh. A (letter of October 14, 2003)(emphasis added)).

In a second letter also dated October 14, 2003, Attorney Nguyen reiterated that the Richards e-mail had been produced, stating that "[w]e have produced to you the initial e-mail communication in that string [of e-mails] which preceded the attorney communications." (# 682, Exh. A (second letter of October 14, 2003)). The "initial e-mail communication" refers to the first entry on the privilege log submitted to the SEC, which is, in fact, the Richards e-mail.

In these circumstances, it cannot be realistically claimed that the production of the Richards e-mail was inadvertent. The Court rules that it was not.

### III. The Consequences of the Production of the Richards E–Mail

#### A. Attorney–Client Privilege

■ There does not seem to be any doubt that the Richards e-mail would be protected from disclosure by the attorney-client privilege but for KMPG's production of a copy of it to Class Plaintiffs. "The privilege protects 'not only the giving of professional advice to those who can act but also for the giving of information to the lawyer to enable him to give sound and informed advice.'" *Texaco Puerto Rico, Inc. v. Department of Consumer Affairs*, 60 F.3d 867, 883 (1 Cir., 1995) *quoting Upjohn v. United States*, 449 U.S. 383, 390, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Richards obviously gave Breslow the information about the anonymous caller for the purpose of either getting legal advice or for enabling Breslow to give legal advice to KMPG.

■ The consequences of the knowing disclosure of material protected by the attorney-client privilege such as the Richards e-mail are quite clear. The First Circuit has held that with respect to the attorney-client privilege, "[i]n general, a waiver premised on

inadvertent disclosure will be deemed to encompass all other such communications on the same subject." *Texaco Puerto Rico, Inc.*, 60 F.3d at 883–4 (citations omitted). If this is the law with respect to inadvertent disclosure, it is surely the rule for knowing disclosures. Thus, the Court rules that KMPG has waived its right to assert the attorney-client privilege as to the 15 e-mails on the same subject which KMPG claims are privileged and which have been placed on its privilege log.

### B. Work Product Doctrine

■ The same type of waiver occurs with respect to documents protected by the work product doctrine; however, the waiver only occurs when a document otherwise protected as work product is shared with an adversary. *United States v. Massachusetts Institute of Technology*, 129 F.3d 681, 687 (1 Cir., 1997).

KMPG argues that it has never claimed the protection of the work product doctrine as to the Richards e-mail. Class Plaintiffs seem to agree. (*See* # 700, p. 14–15). Thus, the disclosure of the Richards e-mail does not operate as a waiver of work product protections which might permit KMPG to withhold the other 15 e-mails on the same subject. The question remains, however, whether these e-mails are protected by the work product doctrine at all.

### IV. Are the 15 E-Mails Protected by the Work Product Doctrine?

To be protected, the e-mails must have been "...prepared in anticipation of litigation or for trial." Rule 26(b)(3), Fed.R.Civ.P. Over twenty years ago, I initially laid out the test which seemed to me to be the most sensible method for determining whether a document met this definition, and I reaffirmed my view fifteen years ago.

In the case of *HI–G Incorporated and Defiance Circuit Corporation v. Insurance Company of North America*, 35 F.R.Serv.2d 861 (D.Mass., 1982), I set out my view as to the test to be applied in determining whether a document is prepared "in anticipation of litigation." I wrote:

In my view, the most sensible test enunciated in the cases as to whether something is done or prepared "in anticipation of litigation" is the one found in Wright and Miller[, & Marcus], *Federal Practice and Procedure:* Civil, Sec.2024 (1970), p. 198, wherein it is stated that, in dealing with the question of whether documents are prepared "in anticipation of litigation" (Rule 26(b)(3), F.R.Civ.P.), "...the test should be whether, in the light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." This test was cited with approval in *Hercules Inc. v. Exxon Corp.*, 434 F.Supp. 136, 151 (D.Del., 1977), wherein the Court indicated that: "The fact that litigation may still be a contingency at the time the document is prepared has not been held to render the privilege inapplicable, if the prospect of litigation is identifiable because of claims that have already arisen." *Id.* citing *Sylgab Steel and Wire Corp. v. Imoco–Gateway Corp.*, 62 F.R.D. 454 (N.D.Ill., 1974) and *Stix Products Inc. v. United Merchants & Manufacturers, Inc.*, 47 F.R.D. 334 (S.D.N.Y., 1969).

*Id.* at 862.

*Winter Panel Corp. v. Reichhold Chemicals, Inc.*, 124 F.R.D. 511, 513–514 (D.Mass., 1989).

It appears that the test, at least to the extent that the question is whether "...the document can fairly be said to have been prepared or obtained because of the prospect of litigation" is still valid. In *State of Maine v. U.S. Department of the Interior*, 298 F.3d 60 (1 Cir., 2002), the First Circuit adopted the "because of" test set out in *United States v. Adlman*, 134 F.3d 1194 (2 Cir., 1998). *State of Maine*, 298 F.3d at 68. In *Adlman*, the Second Circuit wrote:

The formulation of the work-product rule used by the Wright & Miller treatise, and cited by the Third, Fourth, Seventh, Eighth and D.C. Circuits, is that documents should be deemed prepared "in anticipation of litigation," and thus within the

scope of the Rule, if "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 *Federal Practice & Procedure* § 2024, at 343 (1994) (emphasis added). *See In re Grand Jury Proceedings,* 604 F.2d 798, 803 (3d Cir. 1979); *National Union Fire Ins. Co. v. Murray Sheet Metal Co., Inc.,* 967 F.2d 980, 984 (4th Cir.1992); *Binks Mfg. Co. v. National Presto Indus., Inc.,* 709 F.2d 1109, 1118–19 (7th Cir.1983); *Simon v. G.D. Searle & Co.,* 816 F.2d 397, 401 (8th Cir.), *cert. denied,* 484 U.S. 917, 108 S.Ct. 268, 98 L.Ed.2d 225 (1987); *Senate of Puerto Rico v. United States Dep't of Justice,* 823 F.2d 574, 586 n. 42 (D.C.Cir.1987).

The Wright & Miller "because of" formulation accords with the plain language of Rule 26(b)(3) and the purposes underlying the work-product doctrine. Where a document is created because of the prospect of litigation, analyzing the likely outcome of that litigation, it does not lose protection under this formulation because it is created in order to assist with a business decision.

*U.S. v. Adlman,* 134 F.3d 1194, 1202 (2 Cir., 1998).

However, in order to qualify for protection, it must "...fairly be said that [the documents] were created 'because of' actual or impending litigation." *Id. quoting* Wright & Miller, § 2024, at 346. Chief Judge Young in the recent case of *In re Grand Jury Subpoena,* 220 F.R.D. 130, 148 (D.Mass., 2004) adopted the following test as enunciated by the Third Circuit in *United States v. Rockwell Int'l,* 897 F.2d 1255 (3 Cir., 1990):

> "[L]itigation need not be imminent...as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation." (alteration in original) quoting *United States v. El Paso Co.,* 682 F.2d 530, 542 (5th Cir.1982).

*Rockwell Int'l,* 897 F.2d at 1266.

■ In the instant case, KMPG, as the party resisting production of the 15 e-mails, has the burden of demonstrating that the e-mails were prepared in anticipation of litigation. *Amica Mutual Insurance Co. v. W.C. Bradley Co.,* 217 F.R.D. 79, 82–3 (D.Mass., 2003) *citing Sham v. Hyannis Heritage House Hotel, Inc.,* 118 F.R.D. 24, 25 (D.Mass., 1987).

■ The Court finds that KMPG has failed to meet its burden. First, it is hard to see how KMPG could make the showing on these facts that it could "...fairly be said that [the documents] were created 'because of' actual or impending litigation." *Adlman,* 134 F.3d at 1202 *quoting* Wright & Miller, § 2024, at 346. No one had brought any claims against KMPG or even threatened to bring claims; rather, KMPG had received an anonymous report which indicated that a client was lying to KMPG in connection with an audit KMPG was performing. Clearly, this would have been a red flag for KMPG to try to find out more information, as any accounting firm would do when performing an audit and learning that information being given to it by the client was untrue. As Richards says in his e-mail, the situation might very well be "...grounds for resigning from an audit engagement" and notifying the SEC of the "reason for the resignation," but it is hard to see how writing the 15 e-mails could be said to have been primarily motivated by the prospect of future litigation.

Rather, these e-mails would most likely fall within the category of the ordinary course of business of counsel in an accounting firm when the firm learns that a client is feeding it untrue or misleading information. To be sure, the e-mails would be protected by the attorney-client privilege had that not been waived, but to say that anything an attorney for an accounting firm does when confronted with the situation in which a client is giving untrue information is done "in anticipation of litigation" is stretching the concept far beyond any reasonable definition. As stated by the Second Circuit in *Adlman:*

> ...[I]t should be emphasized that the "because of" formulation that we adopt here withholds protection from documents that are prepared in the ordinary course of business *or that would have been created*

*in essentially similar form irrespective of the litigation.*

*Adlman,* 134 F.3d at 1202 (emphasis added).

In sum, from all that appears, the 15 e-mails would have been created by the attorneys for the accounting firm in the ordinary course of their business and would have been created in the same form regardless of any possible future litigation. Accordingly, they are not protected by the work product doctrine.

Second, in the instant case, KMPG has not even attempted to make a showing that these 15 e-mails were prepared "because of" the prospect of litigation. In fact, when KMPG was able to identify "Michael," Breslow had a telephone conversation with him seeking more information. In response to a question from Michael as to whether or not, if he helped KMPG, KMPG would be able to protect his anonymity, Breslow testified that he told Michael that KMPG would "...use whatever information [Breslow] received from him, and follow up with the audit client, if it was, in fact, a client of the firm." (# 701, Exh. C, pp. 18–19). This is more indicative of the ordinary course of business of an attorney representing an accounting firm.

In sum, the Court holds that KMPG has failed to meet its burden of establishing that the 15 e-mails were prepared in anticipation of litigation as that term has been construed in the *Adlman* case, a construction which has been adopted by the First Circuit in the *State of Maine* case. KMPG will be ordered to produce the 15 e-mails.

### V. The Interrogatories

The two disputed interrogatories which Class Plaintiffs have posed to KPMG, and KPMG's responses, read as follows:

*INTERROGATORY NO. 1:* Identify all KPMG clients who in May or June, 2000, met the following description: A large software company, headquartered on the East Coast, that had operations in Europe and that was in the process of making a couple of significant acquisitions in stock-for-stock deals.

*RESPONSE:* ...KPMG objects to Interrogatory No. 1 on the grounds that it would be unduly burdensome, would violate client confidentiality obligations, and would not be relevant to the claims and defenses in this case to require KPMG U.S. to attempt to identify any companies other than Lernout & Hauspie Speech Products, N.V. ("L & H"). Subject to these objections, KPMG U.S. further responds that L & H did not meet the description specified in Interrogatory No. 1.

*INTERROGATORY NO. 2:* Identify any and all steps KPMG personnel could have taken, or did take, during May or June, 2000 to obtain the information requested in Interrogatory No. 1 as a result of communications with the person now known to be Michael Faherty.

*RESPONSE:* ...KPMG objects to Interrogatory No. 2 on the grounds that it seeks privileged information, is compound and calls for speculation.

# 693, Exh. D.

The Court sustains the objection based on "client confidentiality" to Interrogatory # 1.[3] The Court also sustains the objection ("compound and calls for speculation") to Interrogatory # 2 to the phrase "could have taken." However, the Court overrules the objection to Interrogatory # 2 which states that the interrogatory "seeks privileged information."

■ First, the objection to Interrogatory # 2 based on the fact that the interrogatory seeks "privileged information" is an improper invocation of a privilege. To invoke a privilege with respect to an interrogatory, counsel must specify the privilege or protection which is invoked and upon which the client relies in refusing to produce the information. Merely stating that the interrogatory calls for "privileged information" is inadequate.

As an example, while KPMG may have intended to claim that the information sought by the interrogatory was protected by the

---

**3.** Class Plaintiffs also complain that to the extent that Interrogatory # 1 is answered, the interrogatory is not signed by an agent of KPMG "under oath." If this manifest insufficiency has not been rectified to date, KPMG is ORDERED to rectify it *on or before the close of business on Tuesday, June 15, 2004.*

attorney-client privilege, the work product doctrine is not a privilege; rather, it is a protection against disclosure. It can be legitimately argued that claiming that an answer calls for "privileged information" is not sufficient to invoke the protections of the work product doctrine, even if stating that the interrogatory calls for "privileged information" were proper, which it is not.

Second, the Court rules that disclosure of any actions which KPMG's attorneys took respecting the Richards e-mail is governed by the subject-matter waiver which occurred when the Richards e-mail was knowingly disclosed to counsel for the Class Plaintiffs. *See* § III.A., *supra.* Further, even if the work product doctrine had been properly invoked as an objection to this interrogatory, the protection would not apply because KPMG has failed to prove that any of its actions taken in response to the Richards e-mail were done "in anticipation of litigation." *See* § IV, *supra.*

### VI. Conclusion and Order

Accordingly, it is ORDERED that Class Plaintiffs Motion to Compel KMPG–LLP to Produce Documents (# 680) be, and the same hereby is, ALLOWED. It is FURTHER ORDERED that Class Plaintiffs' Motion to Compel KMPG LLP to Answer Interrogatories... (# 691) be, and the same hereby is, ALLOWED in part and OTHERWISE DENIED. KPMG is ORDERED, pursuant to Rule 37(a)(2), Fed.R.Civ.P., to produce copies of the 15 e-mails and to answer interrogatory # 2 rephrased as follows:

*INTERROGATORY NO. 2:* Identify any and all steps KPMG personnel did take, during May or June, 2000, to identify the large software company, headquartered on the East Coast, that had operations in Europe and that was in the process of making a couple of significant acquisitions in stock-for-stock deals which was the subject of communications with the person now known to be Michael Faherty.

**on or before the close of business on Tuesday, June 15, 2004.**